

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable Linton G. Savage
County Attorney
Nueces County
Corpus Christi, Texas

Dear Sir:

Opinion No. O-4786
Re: Is it in violation of the statutes of the State of Texas, commonly known as the anti-trust act, for all the banks within a city to enter into an understanding to make service charges for the keeping of deposit accounts of depositors which accounts fall below a certain minimum daily average balance, such service charge being upon the number of checks drawn above a fixed number, and all rates or charges made to be the same in the bank?

We have given careful consideration to your question which is substantially as set out above.

The Texas anti-trust, monopoly and restraint of trade statutes are codified and contained in Title 126 of the Revised Civil Statutes, 1925, and in Chapter 3 of Title 19 of the Revised Criminal Statutes, 1925 (Articles 7426-7447, R. C. S., 1632-1644, Penal Code). For all purposes incident to this opinion the two code provisions are substantially the same.

Article 7426 of the Civil Code and Article 1632 of the Penal Code each contain the following language:

"A 'trust' is a combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons, or either two or more of them for either, any or all of the following purposes:

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

"1. To create, or which may tend to create, or carry out restrictions in trade or commerce or aids to commerce or in the preparation of any product for market or transportation, or to create or carry out restrictions in the free pursuit of any business authorized or permitted by laws of this State.

". . . .

"3. To prevent or lessen competition in the manufacture, making, transportation, sale or purchase of merchandise, produce or commodities, or the business of insurance, or to prevent or lessen competition in aids to commerce, or in the preparation of any product for market or transportation.

". . . ." (Emphasis ours)

Article 7429 of the civil statutes reads as follows:

"Any and all trusts, monopolies and conspiracies in restraint of trade, as herein defined, are prohibited and declared to be illegal."

Civil penalties are prescribed by the terms of Articles 7430 and 7436 of the civil code, while Article 1635 of the Penal Code makes a criminal violation a felony.

While we have been unable to find any case law upon the subject, we do find an enlightening discussion which we deem clear and pertinent, in an opinion written during the year 1917 by the Honorable C. M. Cureton. Report and Opinions, Attorney General of Texas, 1916-1918, p. 151.

At the time of writing the opinion, the late lamented Chief Justice of our Texas Supreme Court was First Assistant Attorney General, serving in the administration of Attorney General B. F. Looney. The question was whether banks operating in this State were amenable to the provisions of the anti-trust and monopoly statutes (Articles 7769-7797, R. C. S., 1911, now Articles 7426-7427, R. C. S., 1925, unchanged). The distinguished writer quoted with approval from earlier opinions of this department, and his treatise is of such force we take the liberty of copying at length. After quoting the provisions of the statutes, he wrote as follows:

Honorable Linton S. Savage, Page 3

"The first question for determination is
whether or not the business of banking is limit-
ed, affected, or controlled by these articles
of the statute defining, prohibiting and pun-
ishing trusts and monpolies. In the first anti-
trust statute of this State, which was passed in
1889 and which corresponds with those portions
of Article 7796 quoted above, we find the fol-
lowing:

"'Section 1. Be it enacted by the Legis-
lature of the State of Texas: That a trust
is a combination of capital, skill, or acts
by two or more persons, firms, corporations,
or associations of persons, or of either two
or more of them, for either, any, or all of
the following purposes: First. To create
or carry out restrictions in trade. Second.
To limit or reduce the production, or in-
crease or reduce the price of merchandise
or commodities. Third. To prevent competi-
tion in manufacture, making, transportation,
sale, or purchase of merchandise, produce,
or commodities. Fourth. To fix at any
standard or figure, whereby its price to the
public shall be in any manner controlled or
established, any article or commodity of
merchandise, produce, or commerce intended
for sale, use, or consumption in this State.'

"You will note that the Act of 1903, which
is the present law, quoted above, materially
changed the meaning and application of the orig-
inal Act of 1889. From reading the two it will
be observed that the scope of the Act was broaden-
ed and made to apply not only to articles of
trade and commerce, but to 'aids to commerce';
also that the Anti-trust Act was made to apply
to any act or combination, the purpose of which
was 'to create or carry out restrictions in the
free pursuit of any business authorized or per-
mitted by the laws of this State.' These mater-
ial and far reaching amendments to the law were
made subsequent to the opinion of the Supreme
Court of the State in the case of the Queen In-
surance Company vs. The State, 86 Texas, page
250, in which case the court held that the busi-
ness of insurance was not affected by the Anti-
trust Act; that insurance was neither trade nor

Honorable Linton S. Savage, Page 4

commerce, and, therefore, insurance companies could with impunity enter into combinations of any kind and character (86 Texas, 264, 265). In the course of this opinion the Supreme Court declared that insurance was not trade, traffic or commerce, but that 'it is an aid to commerce.' Following this opinion and no doubt as a direct result thereof, the Legislature in 1903 amended the anti-trust and monopoly statutes, and made them apply not only to trade and commerce, but to aids to commerce and to any business authorized or permitted by the laws of Texas. The banking business is, of course, one authorized and permitted by the laws of Texas, and is, we believe, an 'aid to commerce.' The Supreme Court of the United States has held that a dealer in exchange supplies an instrument of commerce. Nathan v. Louisiana, 8 Howard, 73.

"The business of a State bank, or rather the powers which it may exercise, is set forth in Revised Statutes, Art. 376, which reads:

"'Section 72. Powers of Banking Corporations. - Every such corporation shall be authorized and empowered to conduct the business of receiving money on deposit, and allowing interest thereon, and of buying and selling exchange, gold and silver coins of all kinds; of loaning money upon real estate and personal property and upon collateral and personal securities at a rate of interest not exceeding that allowed by law; provided, that no bank organized under this title shall loan more than fifty per centum of its securities upon real estate; and no such bank shall make a loan on real estate of an amount greater than fifty per centum of the reasonable cash value thereof; also of buying, selling and discounting negotiable and non-negotiable paper of all kinds, as well as all kinds of commercial paper. (R. S., Art. 376; Acts, 1905, S. S., 490, Sec. 3.)' C. & H. Banking Laws, Sec. 72, 83.

"Manifestly, a corporation exercising those powers and functions is aiding commerce and the

country in a very practical and material way. Argument would seem superfluous. Commerce cannot exist without cash, credit and a system of quick, certain and inexpensive exchange. These things banks supply. They collect into great reservoirs the cash and credit of the country, from which it is distributed into industry and commerce in such amounts and at such times as business may demand. Banks are not unlike lakes and reservoirs in which are collected surplus waters for redistribution for purposes of irrigation, and are as essentially aids to commerce as the latter to successful agricultural production. In fact, the Supreme Court of the United States has declared the safety of the business of banking to be one of the primary conditions of successful commerce. In the case of Noble State Bank vs. Haskell, 219 U. S. 111, that court, in referring to the guaranty of bank deposits, declares:

"'It may be said in a general way that the police power extends to all the great public needs. Camfield vs. United States, 167 U. S., 518. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare. Among matters of that sort probably few would doubt that both usage and preponderant opinion give their sanction to enforcing the primary conditions of successful commerce. One of those conditions at the present time is the possibility of payment by checks drawn against bank deposits, to such an extent do checks replace currency in daily business. If then the Legislature of the State thinks that the public welfare requires the measure under consideration, analogy and principle are in favor of the power to enact it. Even the primary object of the required assessment is not a private benefit, as it was in the cases above cited of a ditch for irrigation or a railway to a mine, but it is to make the currency

Honorable Linton S. Savage, Page 6

of checks secure, and by the same stroke
to make safe the almost compulsory resort
of depositors to banks as the only avail-
able means for keeping money on hand.'

"We conclude, on the whole, then, that
the business of banking is within the protec-
tive, inhibitory and penal provisions of the
anti-trust laws of this State, and that banks
and bankers are as much bound to respect the
anti-trust laws as are dealers in commodities.
This conclusion is in harmony with the opin-
ions of this office on the subject of banking
from the beginning. On January 11, 1912, the
Attorney General of the State, in an opinion
written by the Honorable John W. Brady, Assis-
tant Attorney General, held that an agreement
entered into between the banking institutions
of a city prohibiting overdrafts, would be
in violation of the anti-trust law; not that
any bank on its own motion might not prohibit
overdrafts, but that, when two or more banks
entered into a combination for this purpose,
that such combination violated the anti-trust
laws. This opinion was predicated upon the
propositions that the banking business was
an aid to commerce, and was a business au-
thorized and permitted by the laws of this
State and in which the statute prohibited any
agreement tending to restrict the business.
In this opinion Judge Brady in part said:

"'The question now recurs: Does the
practice of allowing overdrafts, of the
character above named, constitute com-
merce or aids to commerce? There is
strong authority for the proposition that
bills of exchange, drafts, checks and
other like paper are commercial instru-
ments to facilitate commerce, and, if not
part of the commerce itself, fairly come
within the term, and may be designated as
'aids to commerce' (see 9 Mich., 241; Nathan
vs. Louisiana, 17 U. S., 507); and the
practice being legal, any agreement or
understanding by and between two or more
banks of a city prohibiting absolutely the

Honorable Linton S. Savage, Page 7

granting of such privileges, upon the part
of all the parties to the agreement, would
in our opinion, create and tend to create
and carry out restrictions in commerce and
aids to commerce and would therefore be
violative of Section 1 of said Act.

"'We are further of the opinion that such
an agreement would create and carry out re-
strictions in the free pursuit of a business
authorized or permitted by the laws of this
State, within the purview of said statute.
The banking business is one authorized and
permitted by the laws of the State; and the
making of loans in the way of overdrafts is
a part of such business and a usual and
familiar feature of modern banking. Indeed,
some of the authorities treat the same as a
practical necessity in the conduct of such
business, although this view is doubtless
too broad. At all events, when pursued with
a reasonable degree of prudence and accord-
ing to the ordinary usage, it is free from
illegality, under the present state of the
law, and any agreement or understanding
whereby banks, parties to the same, bind
themselves not to grant this privilege to
their customers, creates and carries out
restrictions in the free pursuit of their
business within the meaning of said statute.
In the absence of such an agreement or under-
standing, the banks would each be free to
allow this privilege to their customers;
and, since they agree to discontinue the
usage and practice, they thereby necessarily
restrict their freedom to act in a matter of
business, which they would otherwise be free
to do. We cannot conceive how it could be
held that under such an agreement each party
thereto would not be restricting the free
pursuit of the business of every other party
thereto, as well as his own business. It
follows from what has been said that an agree-
ment of the character suggested would be il-
legal and would subject the parties thereto
to the penalties of the Act.' Vol. 25,
Opinions of the Attorney General, 171-2.

Honorable Linton S. Savage, Page 8

"Prior to this time, however, the Attorney General had held that the banking business was subject to the limitations of the anti-trust laws. On February 25, 1907, the Attorney General held that any agreement between banks to fix collection charges constituted restrictions in violation of the anti-trust laws. In that opinion the Attorney General in part said:

"' You are respectfully advised that Sub-division 1 of Section 1 of the Anti-trust Act of 1903, defines a trust to be * * * a combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons, or either two or more of them for either, any, or all of the following purposes: "To create or which may tend to create or carry out restrictions in trade or commerce or aids to commence or in the preparation of any product for market or transportation, or to create or carry out restrictions in the free pursuit of any business authorized or permitted by laws of this State."

"'Bills of exchange, drafts, and the character of paper to which you refer are commercial instruments to facilitate commerce, and if not a part of the commerce itself, clearly come within the term and may be designated "an aid to commerce" (9 Mich., 241; Nathan vs. Louisiana, 17 U. S., 507); and any combination, agreement, or understanding between banks to fix the charge for collections, would, in my opinion, constitute a restriction in commerce and aids to commerce, in violation of said act.

"'Again. The understanding, if adopted, and acted upon by any two or more of the banks, would violate that provision of the same section quoted, which prohibits the creation or carrying out of the restrictions in the free pursuit of any business authorized or permitted by the laws of this State. Collections such as you have mentioned are a part of such business, and any understanding between banks to charge

808

not less than a certain rate for collections creates a restriction in the free pursuit of that business within the terms of that act. The purpose of the law is to encourage the widest character of competition between all persons engaged in a similar business, and to prevent any understandings or agreements whereby any such person can not exercise his own free judgment in carrying on his business, and perform the services incident thereto at whatever price he may see fit to charge.' Reports and Opinions of Attorney General, 1906-1908, 393.

"You are, therefore, advised that the business of banking in this State is subject to the anti-trust laws, and those corporations and individuals engaged in this business, violating the anti-trust laws, may be punished the same as other persons violating the same Acts."

There is little that we can add to the foregoing. After considerable research, we have not found any case in conflict with the conclusions announced in the Cureton opinion or those from which it quotes, especially on the controlling point - that the conduct of a bank's business is an "aid to commerce." We are of opinion that an agreement or "understanding" by and between all the banks of a city to make certain charges (such as described in your question) would constitute a "combination of capital, skill or acts" for the purpose of carrying out restrictions in "aids to commerce", in violation of the provisions of Articles 7426, R. C. S., and 1632, Penal Code, supra.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By *Benjamin Woodall*

Benjamin Woodall
Assistant

APPROVEDSEP 10, 1942

*Gerald C. Mann*

ATTORNEY GENERAL OF TEXAS

BW:GO



APPROVED
OPINION
COMMITTEE
BY *Bush*
CHAIRMAN